# UNITED STATES DISTRICT COURT

for the

__________ District of CT

__________ Division

AUG 11 2026 PM2:11
FILED-USDC-CT-HARTFORD

| | |
|---|---|
| JOHN CARLO MANIGAULTE, PRO SE<br><br>*Plaintiff(s)*<br>*(Write the full name of each plaintiff who is filing this complaint. If the names of all the plaintiffs cannot fit in the space above, please write "see attached" in the space and attach an additional page with the full list of names.)*<br><br>-v-<br><br>see attached<br><br>*Defendant(s)*<br>*(Write the full name of each defendant who is being sued. If the names of all the defendants cannot fit in the space above, please write "see attached" in the space and attach an additional page with the full list of names.)* | Case No. ____________<br>*(to be filled in by the Clerk's Office)*<br><br>Jury Trial: *(check one)* ☑ Yes ☐ No |

## COMPLAINT FOR A CIVIL CASE

## I. The Parties to This Complaint

### A. The Plaintiff(s)

Provide the information below for each plaintiff named in the complaint. Attach additional pages if needed.

| | |
|---|---|
| Name | JOHN CARLO MANIGAULTE |
| Street Address | 55 BRITTANY FARMS ROAD, APT. 215 |
| City and County | NEW BRITAIN, HARTFORD |
| State and Zip Code | CT, 06053-1204 |
| Telephone Number | (631) 372-9073 |
| E-mail Address | jmanigaulte@gmail.com |

### B. The Defendant(s)

Provide the information below for each defendant named in the complaint, whether the defendant is an individual, a government agency, an organization, or a corporation. For an individual defendant, include the person's job or title *(if known)*. Attach additional pages if needed.

FULL LIST OF DEFENDANTS

FREDERIC L. WARD; JAMES BORATKO; SANDRA WARD; FIRST CHURCH OF CHRIST, CONGREGATIONAL, IN WEST HARTFORD; SOUTHERN NEW ENGLAND CONFERENCE OF THE UNITED CHURCH OF CHRIST (IN THEIR INDIVIDUAL AND OFFICAL CAPACITIES)

AUG 11 2026 PM2:11
FILED-USDC-CT-HARTFORD

Defendant No. 1

| | |
|---|---|
| Name | FREDERIC L. WARD |
| Job or Title *(if known)* | REVEREND |
| Street Address | 186 PRIVILEGE ROAD |
| City and County | BLOOMFIELD, HARTFORD |
| State and Zip Code | CT, 06002 |
| Telephone Number | 860-233-9605 x101 |
| E-mail Address *(if known)* | Fredd.ward@whfirstchurch.org |

Defendant No. 2

| | |
|---|---|
| Name | JAMES BORATKO |
| Job or Title *(if known)* | MUSIC DIRECTOR |
| Street Address | 70 EAST MOUNTAIN ROAD |
| City and County | CANTON, HARTFORD |
| State and Zip Code | CT, 06019 |
| Telephone Number | 860-233-9605 x109 |
| E-mail Address *(if known)* | jim.boratko@whfirstchurch.org; jeboratko@gmail.com |

Defendant No. 3

| | |
|---|---|
| Name | SANDRA WARD |
| Job or Title *(if known)* | |
| Street Address | 186 PRIVILEGE ROAD |
| City and County | BLOOMFIELD, HARTFORD |
| State and Zip Code | CT, 06002 |
| Telephone Number | 860-526-8386 |
| E-mail Address *(if known)* | |

Defendant No. 4

| | |
|---|---|
| Name | FIRST CHURCH OF CHRIST, CONGREGATIONAL, IN WEST HARTFORD |
| Job or Title *(if known)* | |
| Street Address | 12 SOUTH MAIN STREET |
| City and County | WEST HARTFORD, HARTFORD |
| State and Zip Code | CT, 06107 |
| Telephone Number | (860) 233-9605 |
| E-mail Address *(if known)* | office.manager@whfirstchurch.org |

| | |
|---|---|
| Defendant No. 5 | SOUTHERN NEW ENGLAND CONFERENCE OF THE UNITED CHURCH OF CHRIST |
| Name Job or Title (if known) | DARRELL GOODWIN, PRESIDENT |
| Street Address | 1 BADGER ROAD |
| City and County | FRAMINGHAM, MIDDLESEX |
| State and Zip Code | MA, 01702 |
| Telephone Number | 866-367-2822 |
| E-mail Address (if known) | goodwind@sneucc.org |

## II. Basis for Jurisdiction

Federal courts are courts of limited jurisdiction (limited power). Generally, only two types of cases can be heard in federal court: cases involving a federal question and cases involving diversity of citizenship of the parties. Under 28 U.S.C. § 1331, a case arising under the United States Constitution or federal laws or treaties is a federal question case. Under 28 U.S.C. § 1332, a case in which a citizen of one State sues a citizen of another State or nation and the amount at stake is more than $75,000 is a diversity of citizenship case. In a diversity of citizenship case, no defendant may be a citizen of the same State as any plaintiff.

What is the basis for federal court jurisdiction? *(check all that apply)*

☑ Federal question ☐ Diversity of citizenship

Fill out the paragraphs in this section that apply to this case.

### A. If the Basis for Jurisdiction Is a Federal Question

List the specific federal statutes, federal treaties, and/or provisions of the United States Constitution that are at issue in this case.

This court has subject-matter jurisdiction over the federal statutory claims pursuant to 28 U.S.C. Section 1331 (federal question), 42 U.S.C. Section 1981 (Equal Rights Under Law / Ancestry Discrimination and Retaliation), the Fair Labor Standards Act (29 U.S.C. Section 216(b), and the Americans With Disabilities Act (42 U.S.C. Section 12117 & Section 12203). This court has Supplemental Jurisdiction pursuant to 28 U.S.C. Section 1367. Because there are interconnected complex federal and state issues concerned, please see the attachment provided.

### B. If the Basis for Jurisdiction Is Diversity of Citizenship

1. The Plaintiff(s)

a. If the plaintiff is an individual

The plaintiff, *(name)* ____________________, is a citizen of the State of *(name)* ____________________.

b. If the plaintiff is a corporation

The plaintiff, *(name)* ____________________, is incorporated under the laws of the State of *(name)* ____________________, and has its principal place of business in the State of *(name)* ____________________.

*(If more than one plaintiff is named in the complaint, attach an additional page providing the same information for each additional plaintiff.)*

2. The Defendant(s)

a. If the defendant is an individual

The defendant, *(name)* ____________________, is a citizen of the State of *(name)* ____________________. Or is a citizen of *(foreign nation)* ____________________.

b. If the defendant is a corporation

The defendant, *(name)* ________________, is incorporated under the laws of the State of *(name)* ________________, and has its principal place of business in the State of *(name)* ________________.

Or is incorporated under the laws of *(foreign nation)* ________________, and has its principal place of business in *(name)* ________________.

*(If more than one defendant is named in the complaint, attach an additional page providing the same information for each additional defendant.)*

3. The Amount in Controversy

The amount in controversy–the amount the plaintiff claims the defendant owes or the amount at stake–is more than $75,000, not counting interest and costs of court, because *(explain)*:

## III. Statement of Claim

Write a short and plain statement of the claim. Do not make legal arguments. State as briefly as possible the facts showing that each plaintiff is entitled to the damages or other relief sought. State how each defendant was involved and what each defendant did that caused the plaintiff harm or violated the plaintiff's rights, including the dates and places of that involvement or conduct. If more than one claim is asserted, number each claim and write a short and plain statement of each claim in a separate paragraph. Attach additional pages if needed.

See Attached.

## IV. Relief

State briefly and precisely what damages or other relief the plaintiff asks the court to order. Do not make legal arguments. Include any basis for claiming that the wrongs alleged are continuing at the present time. Include the amounts of any actual damages claimed for the acts alleged and the basis for these amounts. Include any punitive or exemplary damages claimed, the amounts, and the reasons you claim you are entitled to actual or punitive money damages.

See Attached.

## V. Certification and Closing

Under Federal Rule of Civil Procedure 11, by signing below, I certify to the best of my knowledge, information, and belief that this complaint: (1) is not being presented for an improper purpose, such as to harass, cause unnecessary delay, or needlessly increase the cost of litigation; (2) is supported by existing law or by a nonfrivolous argument for extending, modifying, or reversing existing law; (3) the factual contentions have evidentiary support or, if specifically so identified, will likely have evidentiary support after a reasonable opportunity for further investigation or discovery; and (4) the complaint otherwise complies with the requirements of Rule 11.

### A. For Parties Without an Attorney

I agree to provide the Clerk's Office with any changes to my address where case–related papers may be served. I understand that my failure to keep a current address on file with the Clerk's Office may result in the dismissal of my case.

Date of signing: August 10, 2026

Signature of Plaintiff: John Carlo Manigaulte

Printed Name of Plaintiff: John Carlo Manigaulte

### B. For Attorneys

Date of signing:

Signature of Attorney

Printed Name of Attorney

Bar Number

Name of Law Firm

Street Address

State and Zip Code

Telephone Number

E-mail Address

**I. Statement of Claim**

1. I am a classically trained musician originally hired by First Church of Christ Congregational in West Hartford to perform music on Sunday services. In the beginning, I was paid (See Exhibit "A"); then I mysteriously became a "volunteer" musician without my verbal or written consent. I had complained about racial discrimination in an email.
2. Beginning in 2025, I was engaged in the protected activity of learning under the music director's supervision how to play the pipe organ (so I could begin to earn money as a substitute organist for Sunday services when the Music Director was unable or on vacation) (See Exhibits "B" and "C"). As time passed, I began to question the legality, fairness, and aesthetics of funneling church resources to a university group of faculty and students from the pastor's brother's university (See Exhibit "D").
3. To silence my inquires and to put to rest my complaint about racism, the pastor and music director conspired to conjure up a false, pretextual reason ("uncomfortable female librarians") to abruptly terminate future pipe organ lessons and gainful employment.
4. There were never any complaints about me visiting the library after practicing the organ to have a coffee and study religious matters. I even performed several puppet shows for the two-year-olds who visited the library on several occasions.
5. The head teacher of the childcare program was even considering hiring me to work with the children because I am good with children and I have a B.S. in Education, Kindergarten through 12th Grade. I did my best to help the church understand that I could be a very valuable paid asset as a substitute organist and childcare educational puppeteer.
6. The persistent and aggressive, manufactured reasons for terminating my employment as well as the pastor (and his wife) calling municipal police departments to issue "trespass warnings" against me as relates to the church and their personal residences caused me to experience a life-threatening hypertensive emergency, landing me in the UCONN Emergency Department (See Exhibit "E"). Medication for stress lowered my blood pressure to a much safer level, though my eye was damaged due to the extreme blood pressure caused by provoked stress. My PCP, Dr. David Silver, noted that my blood pressure was elevated due to stress even two days later (See Exhibit "F").
7. The pastor and his wife had previous knowledge I suffered with a very serious heart condition (See Exhibit "G"). In fact, many members of the church (and the pastor and his wife) saw me use a quiet oxygen cannister during Sunday services on many an occasion, and sometimes I wore a neck brace, or an eyepatch after retinal surgery in January 2026 (See Exhibit "H"). I had also emailed the music director early on and informed him that excessive stress caused me to experience dangerous hypertension. In other words, the defendants knowingly fabricated a very dangerous harassment claim against me—a vulnerable, medically fragile individual to cover up racial animus and financial nepotism, demonstrating a reckless disregard for my life and my health.
8. This lawsuit names five specific defendants to hold as both individual bad actors and as institutional financial offenders of the rule of law. Jointly and severally liable I hold

Reverend Frederic L. Ward, Music Director James Boratko, Sandra Ward, First Church of Christ Congregational in West Hartford (hereafter "First Church"), and the Southern New England Conference of the United Church of Christ (hereafter "SNEUCC").

9. SNEUCC holds the sole jurisdictional authority to suspend the pastor and secure the local servers. Under Section 2, Article 6, Page 109 of the UCC's own Manual on Ministry, clergy fitness reviews and accountability are explicitly centralized within the conference networks. SNEUCC was supposed to step in and prevent further injuries to me. It did not.
10. SNEUCC received detailed, itemized disclosures of Fair Labor Standards Act (FLSA) wage theft, tax non-compliance, and direct racial discrimination. When SNEUCC Area Conference Minister Rev. Elizabeth Garrigan-Byerly issued a written statement to me refusing to execute data-preservation overrides or initiate a fitness review of Reverend Ward and Music Director James Boratko, she clearly demonstrated Willful Blindness on the part of SNEUCC.
11. Per my understanding, a parent organization that has the internal authority to act but flatly refuses to do so to protect a worker's civil rights can be sued as a **Joint Employer.**

**Part 1: Jurisdiction and Venue**

1. **Federal Question Jurisdiction**: This Court has subject-matter jurisdiction over the federal statutory claims pursuant to **28 U.S.C. § 1331** (federal question), **42 U.S.C. § 1981** (Equal Rights Under the Law / Ancestry Discrimination and Retaliation), the **Fair Labor Standards Act** (**29 U.S.C. § 216(b)**), and the **Americans with Disabilities Act** (**42 U.S.C. § 12117 & § 12203**). Venue is also proper via **28 U.S.C. § 1391(b)(2).**

2. **Supplemental Jurisdiction**: This Court has Supplemental Jurisdiction over the Plaintiff's state-law statutory and common-law tort claims pursuant to **28 U.S.C. § 1367**. The state law claims are so related to the federal civil rights and wage claims that they form part of the same case or controversy under Article III of the United States Constitution, and they arise directly from a common nucleus of operative facts—namely, the discriminatory performance restrictions, systemic wage manipulation, and subsequent retaliatory eviction, multi-jurisdictional police weaponization, and emergency medical crisis engineered by the Defendants.

3. **Applicable State Statutes**: The state statutory claims invoked under supplemental jurisdiction include, but are not limited to:

   - **Connecticut Whistleblower Protection Act** (Conn. Gen. Stat. **§ 31-51m**)
   - **Workplace Free Speech Protection Act** (Conn. Gen. Stat. **§ 31-51q**)
   - **Connecticut Place of Public Accommodation Act** (Conn. Gen. Stat. **§ 46a-64**)
   - **Connecticut Fair Employment Practices Act** (Conn. Gen. Stat. **§ 46a-60**)

- **Connecticut Criminal Larceny by Wage Theft and Civil Statutory Theft Acts** (Conn. Gen. Stat. § **31-71a** through § **31-71i**, § **31-72**, and § **52-564**)
- **Connecticut Computer Crimes Act** (Conn. Gen. Stat. § **53a-251**)

4. **Applicable Common Law**: The state common-law claims invoked under supplemental jurisdiction include: Intentional Infliction of Emotional Distress (IIED) via exploitation of known medical vulnerabilities; Negligent Infliction of Emotional Distress (NIED); Abuse of Process; Defamation *Per Se* and Defamation by Conduct; False Light Invasion of Privacy; Intrusion Upon Seclusion; Negligent Misrepresentation and Inducement; Negligent Supervision and Retention; Breach of Implied Contract (*The Torosyan Doctrine*); Breach of the Implied Covenant of Good Faith and Fair Dealing; Promissory Estoppel; Tortious Interference with a Business Expectancy; and Civil Conspiracy.

5. **Venue (additional information)**: Per **28 U.S.C. § 1391(b)(2),** venue is proper because one of the Defendants—The Southern New England Conference of the United Church of Christ (SNEUCC)—has its headquarters and main office at 1 Badger Road in Framingham, Massachusetts, and operates a regional office at 805 Old Main Street in Rocky Hill, Connecticut.

**Part 2: The Statement of Claims (Causes of Action)**

**COUNT I: Retaliation in Violation of 42 U.S.C. § 1981**

- **Paragraph A (Protected Activity)**: Plaintiff was an employee of First Church and engaged in legally protected activity under Section 1981 by opposing and questioning the Defendants' discriminatory practices that systematically excluded an Indigenous musical instrument (Cherokee Native Flute) from being used during sacraments (<u>See</u> Exhibit "I"). This exclusion occurred while secular Western musical instruments (including a secular jazz band and a light-skinned Western flutist) were regularly permitted. This practice directly defied the Defendants' publicly and proudly disseminated "Open and Affirming" (ONA) policies, which established a material non-discriminatory baseline for its workers.

- **Paragraph B (Employer Knowledge)**: Defendants were fully aware of Plaintiff's non-confrontational opposition to racial and ancestry discrimination, which was explicitly communicated via written emails regarding the selective ban on the Native Flute and the resulting "bad optics" of censoring Indigenous culture.

- **Paragraph C (Adverse Action)**: Defendants took immediate, adverse employment action by abruptly terminating Plaintiff's employment and locking him out of the facility on June 22, 2026. This termination was executed through aggressive, public

Defamation *Per Se* and Defamation by Conduct, utilizing church staff to march Plaintiff out of the building with his personal belongings in full view of public patrons.

- **Paragraph D (Causation & Pretext)**: An undeniable causal connection exists between Plaintiff's complaints and his termination, as evidenced by a strict 24-hour temporal proximity: the music director placed Plaintiff on the summer roster on June 21, 2026, and the hostile eviction was executed a mere 24 hours later. To mask their discriminatory motives, Defendants fabricated a pretextual "staff discomfort" allegation without generating any written documentation or conducting an investigation. Defendants' bad faith is further demonstrated by their total failure to respond to a formal Demand for a Bill of Particulars (See Exhibit "J"; the Bill of Particulars that the process server witnessed and served on Ward and Boratko were signed) served by a licensed process server who sent us affidavits of service (See Exhibit "K").

**COUNT II: Whistleblower Retaliation (Connecticut Gen. Stat. § 31-51m)**

- **Paragraph A (Protected Activity)**: During the course of his employment, Plaintiff engaged in protected activity under C.G.S. § 31-51m by internally reporting, opposing, and questioning a suspected illegal, two-tiered payroll scheme. Plaintiff questioned why management systematically withheld accrued wages from select musicians while compensating a preferred inside network "all the time" for identical services, as confirmed by multiple direct witnesses. Plaintiff further questioned whether these financial irregularities and forced "volunteer statuses" constituted illegal Private Inurement favoring a 24-person nepotistic network tied directly to the university where the pastor's brother serves as president.

- **Paragraph B (Retaliatory Discharge)**: Plaintiff was terminated and barred from his workplace solely or primarily because he raised these verbal and written inquiries regarding criminal wage theft, worker misclassification under the state's ABC labor test, and suspected 501(c)(3) tax non-compliance.

- **Paragraph C (Severe Physical & Emotional Damages)**: As a direct and proximate result of this retaliatory termination, Plaintiff suffered lost wages, catastrophic damage to his professional reputation, and severe physical injuries. Reverend Frederic L. Ward and Sandra Ward maliciously weaponized multiple municipal police departments to deliver successive, jurisdictionally flawed arrest threats to Plaintiff, despite possessing explicit, written notice since July 2, 2024, of Plaintiff's pre-existing Coronary Artery Disease (CAD) and spinal disease. This intentional harassment exploded Plaintiff's blood pressure to a life-threatening emergency level of 200/100, causing permanent retinal damage and forcing an emergency hospitalization at the UConn Health Emergency

Department. Defendants further demonstrated severe malice by causing an additional law enforcement threat to be delivered to Plaintiff while he was actively trapped in the hospital emergency waiting room.

**COUNT III: Wage Theft / Failure to Pay Wages (Connecticut Gen. Stat. § 31-71c & § 31-72)**

- **Connecticut Public Policy Wrongful Discharge Link**: Pursuant to the foundational doctrine established in ***Sheets v. Teddy's Frosted Foods, Inc.*** (1980), an employer cannot weaponize a lockout or discharge to violate a clear mandate of state public policy, which explicitly includes Connecticut's strict statutory prohibitions against the withholding of earned wages.

- **Paragraph A (Unlawful Reclassification)**: Defendants violated Connecticut labor laws by failing to pay Plaintiff regular, accrued wages for all hours actually worked, unlawfully and retroactively reclassifying mandatory working hours as "voluntary" service to mask a financial dispute. SNEUCC allowed these violations to occur despite being contractually and institutionally positioned to oversee and stop them.

- **Paragraph B (Disparate Treatment)**: While financial favoritism was shown via unearned or preferred payments to insiders within the pastoral nepotism pipeline, Plaintiff's legitimate earned wages were withheld, paid irregularly, or completely denied, as documented in Plaintiff's contemporaneous BILL.com and digital logs. SNEUCC consistently refused to fulfill its mandated institutional functions to police and rectify this unlawful behavior.

- **Paragraph C (Statutory Remedies)**: Pursuant to C.G.S. § 31-72, because the Defendants' withholding of earned payroll wages was entirely discretionary, arbitrary, and conducted in bad faith, Plaintiff is entitled to recover all unpaid wages, mandatory treble (triple) damages, reasonable attorney's fees, and full personal management liability against the individual administrators who authorized the wage suppression.

**COUNT IV: Breach of Implied Contract (Connecticut Common Law)**

- **Paragraph A (Establishment of Contract)**: A binding implied contract of employment, non-discrimination, and fair treatment existed between Plaintiff and Defendants. This contract was securely established through a continuous, successful course of payroll history (The Torosyan Doctrine), the church's official personnel policies, operational handbooks, and its public, formal covenant as an "Open and Affirming" (ONA)

institution, upon which Plaintiff reasonably relied. SNEUCC allowed this implied contract to be breached and altered unilaterally without consent.

- **Paragraph B (The Breach)**: Defendants directly breached these explicit and implied agreements by executing a bad-faith termination and complete facility lockout based on a completely falsified, uninvestigated staff complaint. This administrative fabrication was designed entirely to mask their discriminatory motives, censor Plaintiff's ancestry expression, and evade their statutory wage and tax obligations. SNEUCC refused to perform its mandated supervisory duties to intervene or rectify this unlawful termination.

- **Paragraph C (Resulting Injury)**: Plaintiff suffered direct, severe financial, physical, and professional harm due to the Defendants' material breach, effectively destroying his long-term business expectancy and professional relationship with the church parish and the broader SNEUCC community.

**ADDITIONAL COUNTS:**

## 1. Federal Statutory Violations

- **Fair Labor Standards Act (FLSA) Wage Theft (29 U.S.C. § 206):** First Church knowingly accepted Plaintiff's professional piano labor on August 4, 2024, and twice in 2025, but intentionally failed to disburse compensation through BILL for other scheduled musical performances. Despite the church's bad-faith attempt to force a Form W-9 onto Plaintiff and shift him to unrecorded dates, the church exercised absolute "Behavioral Control" (including ordering Plaintiff off his Native Flute and onto a piano), legally rendering him an employee entitled to mandatory minimum wages under the FLSA. *Boundaries of church immunity are governed by Hosanna-Tabor Evangelical Lutheran Church & School v. EEOC (2012), which explicitly notes that the ministerial exception does not bar secular breach of contract or wage claims against religious employers.*

- **FLSA Unpaid Labor Violations (29 C.F.R. § 553.101):** First Church paid active, payroll musicians while neglecting—without prior, explicit written consent—to pay other musician workers, including Plaintiff, who perform the exact same operational duties, which is a direct violation of federal labor standards.

- **FLSA Statutory Retaliation (29 U.S.C. § 215(a)(3)):** The FLSA strictly prohibits an employer from discharging, banning, or otherwise discriminating against an employee because that employee has filed a complaint or inquired about unlawful wage practices. Plaintiff engaged in protected activity by directly challenging management and asking critical questions regarding the church's systemic wage disparity—specifically, why certain active payroll musicians were consistently compensated for their services while other musicians performing identical operational duties were denied pay. The defendants'

immediate implementation of a total facility lockout, ban, and subsequent weaponization of police harassment was a direct, unlawful retaliation for this wage inquiry. *Under McDonnell Douglas Corp. v. Green (1973), clear Pretext is established by the strict chronological timeline: Plaintiff was approved for the summer roster on June 21, and the retaliatory eviction occurred a mere 24 hours later.*

- **Connecticut Public Policy Wrongful Discharge (*Sheets v. Teddy's Frosted Foods, Inc.*, 180 Conn. 549 (1980))**: In Connecticut, the standard "at-will" employment doctrine—which normally allows an employer to fire a worker for any reason or no reason—is completely overridden when an employer terminates, locks out, or bans a worker in violation of an established public policy. Plaintiff invokes the seminal *Sheets* doctrine to establish that First Church and SNEUCC cannot weaponize an employment lockout or facility ban to violate public policies codified in state and federal law, specifically: the public policy against criminal larceny by wage theft (C.G.S. § 31-71); the public policy protecting employees who report suspected tax fraud and payroll manipulation to leadership (C.G.S. § 31-51m); and the public policy protecting an individual's right to clear their name from fabricated accusations of serious crimes or moral offenses. *Under Sheets, because the defendants executed this hostile lockout a mere 24 hours after approving Plaintiff for the summer roster to punish his wage and heritage inquiries, the termination constitutes an actionable tortious violation of Connecticut public policy.*
- **Civil Rights Retaliation (42 U.S.C. § 1981):** First Church punished Plaintiff financially and banned him from the premises after he attempted to engage in protected cultural expression relating to his Native American heritage. *Disparate treatment is established by showing the church banned Plaintiff's Cherokee flute from communion due to "aesthetics" while readily permitting a secular jazz band and a light-skinned musician playing a Western concert flute during the exact same sacraments.*
- **Americans with Disabilities Act (ADA) Associational Discrimination (42 U.S.C. § 12112(b)(4)):** Plaintiff, an organ student with advanced degenerative disc disease, CAD, and ADHD, relies on his home health care aide as a necessary page-turner and assistant. The defendants possessed explicit, written notice as early as July 2, 2024, that severe spine and bone disease drastically impacted mobility and required extended morning physical transitions, making physical assistance at the keyboard quite helpful. First Church explicitly penalized Plaintiff and banned his essential assistant from helping him practice the pipe organ and church piano, unlawfully cutting off helpful physical accommodations for disabilities while negating Plaintiff's future opportunities to earn income where he had previously worked and was paid (at least on some occasions).
- **ADA Retaliation (42 U.S.C. § 12203):** The ADA explicitly prohibits an employer from retaliating against an individual because they opposed a discriminatory act or requested

an accommodation. Because First Church and its managers banned Plaintiff's necessary physical assistant and subsequently terminated and banned Plaintiff after he opposed this withholding of accommodations, the defendants engaged in actionable, willful federal retaliation.

- **Section 1981 Race & Ancestry Discrimination / Retaliation (42 U.S.C. § 1981):** Section 1981 provides immediate access to federal damages. The defendants targeted Plaintiff's Native American heritage by explicitly banning his cultural expression on the Native Flute and imposing an immediate financial lockout, constituting unlawful discrimination and retaliation based on ancestral and ethnic characteristics. (See "Negligent Misrepresentation (Inducement)")

- **Title VII Hostile Work Environment (42 U.S.C. § 2000e-2):** At First Church and under SNEUCC oversight, Plaintiff was subjected to a continuous pattern of targeted workspace harassment, bad-faith electronic surveillance, and discrimination that legally rendered his performance environment hostile. *Under Bollard v. California Province of the Society of Jesus (1999), when a secular court can adjudicate a dispute using neutral, objective legal principles without entangled theological analysis, the First Amendment does not bar judicial review.*

- **Third-Party Retaliation Standing (*Thompson v. North American Stainless*, 2011):** Even if Rev. Ward's and Sandra Ward's primary target of malice was a third party (e.g., David A. Siudzinski, Plaintiff's ADA assistant), Plaintiff has independent federal standing to sue because the co-defendants chose to inflict punishment directly on Plaintiff's household access to future employment and compensation.

## 2. State Statutory Violations (SNEUCC Jurisdiction: CT)

- **Denial of Equal Access to a Place of Public Accommodation (C.G.S. § 46a-64):** First Church does not enjoy absolute private property immunity because it actively operates commercial, secular, and public-facing nodes, including an active library, a daycare facility, open-air and ticketed concerts, spaces rented out for community recovery (AA) meetings, and commercial leasing of its kitchen facilities. By hosting these multi-faceted public streams, the physical facility is legally a "place of public accommodation" under Connecticut law. *Under Quinnipiac Council, Boy Scouts of America v. CHRO (1987), the definition of a public accommodation under C.G.S. § 46a-63 must be interpreted broadly to carry out the state's remedial purpose of eliminating discrimination, and an entity cannot claim private property immunity if its underlying facility operates public-facing nodes.* The defendants directly violated C.G.S. § 46a-64 by discriminatorily revoking Plaintiff's access, implementing a blanket facility lockout, and denying him equal use of these public nodes based strictly on ancestry, cultural expression, disability association, and exposing wage irregularities.

- **Connecticut Whistleblower Protection Act (C.G.S. § 31-51m):** This statute strictly prohibits an employer from disciplining or discharging an employee who reports a suspected violation of law. Plaintiff engaged in protected whistleblowing by internally reporting and questioning a suspected illegal, two-tiered payroll scheme where management systematically withheld accrued wages from select musicians while compensating others "all the time" for identical services, as confirmed by multiple direct witnesses. This protected inquiry, combined with Plaintiff's queries regarding suspected employer FICA tax evasion and his objections to racial discrimination, served as the sole proxy and direct trigger for the defendants' retaliatory eviction, ban, and malicious extrajudicial police targeting.

- **Free Speech Protection in the Workplace (C.G.S. § 31-51q):** This is a powerful Connecticut statute applying constitutional protections to private workplaces. The defendants violated this statute by disciplining and locking Plaintiff out of the workplace to censor his heritage and musical cultural expression—protected speech that in no way interfered with his job performance, especially given strongly implied church contracts advocating in support of "open and affirming" policies and practices.

- **Connecticut Fair Employment Practices Act (CFEPA - C.G.S. § 46a-60):** Prohibits workplace segregation, ancestry discrimination, and immediate retaliation for raising internal human rights concerns in the workplace.

- **Civil Action for Deprivation of Equal Rights (C.G.S. § 52-571d / CFEPA):** Defendants subjected Plaintiff to targeted discrimination, harassment, and segregation that deprived him of equal protection and equal access to institutional facilities in a public venue based on race and ancestry.

- **Connecticut Criminal Larceny by Wage Theft (C.G.S. § 31-71a through § 31-71i):** The intentional withholding of Plaintiff's accrued wages by managers triggers mandatory treble (triple) damages and personal liability for the individual administrators (Rev. Ward and James Boratko) who withheld the funds. Punitive damages are also being sought.

- **Connecticut Computer Crimes Act (C.G.S. § 53a-251):** Connecticut law prohibits the unlawful manipulation of computer systems and software profiles (BILL) to retroactively delete a worker's schedule and mask a financial dispute.

- **Connecticut Civil Statutory Theft (C.G.S. § 52-564):** The intentional withholding, conversion, and concealment of Plaintiff's earned wages and budgeted performance funds by management triggers a mandatory civil triple-damages remedy.

### 3. Common-Law Tort Violations

- **Intentional Infliction of Emotional Distress (IIED)** - Exploitation of Known Medical Vulnerability: The defendants engaged in extreme, outrageous, and unconscionable

conduct that transcends all bounds of civilized decency. *Under Appleton v. Board of Education of Stonington (2000), weaponizing three separate police departments to issue arrest threats to an innocent, disabled senior citizen over a routine dispute constitutes "extreme and outrageous" conduct.* Through a detailed July 2, 2024, email communication directly to Music Director James Boratko, the defendants had long-standing, unambiguous written notice that Plaintiff suffered from severe pre-existing conditions, including Coronary Artery Disease (CAD), spine/bone disease, and hypertensive vulnerabilities triggered by unusual and extreme stress. *Under the foundational Connecticut case Petyan v. Ellis (1986) establishing the "Eggshell Plaintiff" doctrine, a civil defendant takes their victim as they find them and is fully liable for all physical injuries directly triggered by their outrageous actions, regardless of pre-existing frailties.* This targeted harassment intentionally triggered a life-threatening hypertensive emergency, forcing Plaintiff's blood pressure to 200/100 and requiring immediate emergency hospitalization. The defendants demonstrated severe malice by instructing a police department to call and threaten Plaintiff with criminal arrest. Plaintiff was actively trapped in the emergency medical waiting room at the time of a second police call from the Bloomfield Police Department. Defendants' actions (and inactions) caused Plaintiff to suffer profound and severe physical and psychological trauma.

- **Abuse of Process:** Under Connecticut common law, an action for abuse of process lies when a party uses legal, municipal, or law enforcement mechanisms primarily to accomplish an ulterior, illegitimate, or coercive purpose outside the scope of proper legal channels. Following the June 22 eviction, Reverend Frederic L. Ward and his agents initiated a campaign of malicious extrajudicial harassment by contacting multiple municipal police departments to issue fabricated, baseless complaints against Plaintiff. The defendants deployed law enforcement assets to aggressively threaten Plaintiff with criminal arrest and no-trespass warnings, even though neither Plaintiff nor his home health care aide had ever set foot on private property at any time. *The bad-faith nature of this process is established by the Newington Police FOIA log, which explicitly documents that law enforcement reviewed prelitigation affidavits that had been sent by Plaintiff via USPS mail to church librarians and had flatly ruled that no harassment had occurred, vaporizing the church's "disruptive behavior" defense.*

- **Digital Spoliation & Adverse Inference Claims:** *Under Residential Funding Corp. v. DeGeorge Financial Corp. (2002), the binding Second Circuit precedent governing Intentional Data Spoliation, when a party is placed on formal notice of a claim and subsequently fails to preserve server data or video records, the court is authorized to issue an Adverse Inference Instruction.* Because Plaintiff served a formal June 23 Litigation Hold Notice, the church bears 100% of the burden to preserve internal server logs, BILL.com wage records, and camera data. Any destruction of June 21 or June 22 or

other work data thereafter establishes an absolute inference of factual Defendant guilt as a matter of law.

- **Negligent Infliction of Emotional Distress (NIED):** In Connecticut, an NIED claim is viable in an employment context where the termination and lockout process involves inherently unreasonable, humiliating, and egregious conduct. Fabricating egregious misconduct allegations, executing a forced physical march-out using building staff, and maintaining a post-termination campaign of multi-jurisdictional police intimidation that physically sent Plaintiff to the emergency room easily satisfies the threshold for causing egregious emotional and physical distress as well as permanent physical injury.
- **Defamation Per Se:** The fabrication of an unverified sexual misconduct rumor to staff at First Church—orchestrated by Rev. Ward, Sandra Ward, and James Boratko—and the apparent admission in a sermon of having done so automatically presumes devastating harm to Plaintiff's professional reputation.
- **Defamation by Conduct:** Reverend Ward's highly conspicuous and obviously pre-planned physical eviction of Plaintiff on June 22, 2026, presents crystal clear defamation by conduct. Ordering building staff to publicly march Plaintiff out of First Church with his personal belongings falsely and maliciously signaled to the public that Plaintiff was an active threat, a dangerous moral predator. James Boratko directly shared in this malicious conduct.
- **False Light Invasion of Privacy:** Reverend Ward's calculated orchestration of a public, physical eviction—marching Plaintiff out of the building with staff while carrying children's library puppets—falsely and maliciously broadcast to the congregation and to the patrons utilizing the church's public library, daycare, and community meetings that Plaintiff was a dangerous moral predator or physical threat.
- **Intrusion Upon Seclusion (Invasion of Privacy):** Rev. Ward's apparent weaponization of internal facility cameras to intentionally spy on, track, and scrutinize consensual personal conversations in private alcoves of the building constitutes an actionable, offensive invasion of privacy under Connecticut common law. The Reverend did not, indeed could not, produce any evidence of actionable librarian "discomfort."
- **Negligent Misrepresentation (Inducement):** First Church and SNEUCC publicly, formally broadcasted and codified themselves as an "Open and Affirming" (ONA) institution, a designation explicitly designed to represent that the environment was safe from identity-based discrimination, hostility, and heritage suppression. Plaintiff reasonably relied upon these official, material representations when choosing to enter into an employment and performance contract with the church. The defendants' subsequent targeted discrimination, harassment, and lockout proved these representations to be false, negligent, and damaging.

- **Breach of an Implied Contract of Employment (The Torosyan Doctrine):** Under *Torosyan v. Boehringer Ingelheim* (1995), a continuous, successful course of payroll history establishes an implied contract that cannot be retroactively breached or unilaterally altered without consent. Plaintiff offered no consent to not being paid. He expected to be paid sooner or later.

- **Promissory Estoppel:** Because First Church routinely scheduled Plaintiff on a roster demonstrating his ability to play for an entire service (and be paid) as well as his ability to play preludes (some paid, some not), the church and SNEUCC are legally prevented from claiming Plaintiff had suddenly become a "free volunteer" for future musical events.

- **Breach of the Implied Covenant of Good Faith and Fair Dealing:** Rev. Ward's and James Boratko's bad-faith destruction of Plaintiff's performance contract is proof of their personal vendetta against Plaintiff asking too many questions about bizarre employment practices at the church and possessing email evidence revealing administrative racism. Apparently, realizing they had hastily pre-approved Plaintiff's prelude performance for August 2, 2026, which theoretically would have allowed Plaintiff to play the administratively despised Native American Flute, Rev. Ward and James Boratko conspired to banish Plaintiff in perpetuity from the church with fictitious charges.

- **Tortious Interference with a Business Expectancy:** Reverend Ward's explicit and unlawful intervention to shut off Plaintiff's access to the Meeting House for music practice destroyed his long-term professional relationship with the church parish and his expectation to substitute for the organist/music director James Boratko and be paid for doing so.

- **Negligent Supervision and Retention:** This claim directly targets the Church Board and SNEUCC. The institutional leadership knew, or through reasonable diligence should have known, that Reverend Ward, Sandra Ward, and James Boratko were engaging in targeted harassment, wage manipulation, and a dangerous extrajudicial police campaign, yet they completely failed to intervene, supervise, or remove them from power, indirectly and negligently contributing to Plaintiff's hospitalization and profound legal injuries. *Under Gallo v. Gallo (1981), a church body is fully subject to secular laws regarding its corporate, property, and financial transactions.*

- **Civil Conspiracy:** The coordinated, bad-faith collusion between Rev. Frederic L. Ward, Sandra Ward, James Boratko, SNEUCC leadership, and First Church to execute or otherwise support a pre-planned employment lockout, manipulate digital software profiles, weaponize local police forces, and inflict intentional, life-threatening physical and financial harm on Plaintiff constitutes an actionable civil conspiracy.

## 4. Equitable and Quasi-Contract Claims

- **Breach of Contract (Open and Affirming Covenant):** First Church, through its public declarations and corporate bylaws, established a binding, operational covenant to remain an "Open and Affirming" space for all individuals regardless of race, heritage, ethnicity, or disability connection. This ONA designation formed the material basis of the implied contract (as well as an email discussed contract) created between Plaintiff and his employers. The defendants directly breached this implied-and-email-created contract by weaponizing the workplace, banning Plaintiff's Native American cultural expression, and locking Plaintiff's household out from the premises. *This violation of fundamental public policy strips away 501(c)(3) protections under the doctrine established in Bob Jones University v. United States (1983).*
- **Quantum Meruit / Unjust Enrichment:** First Church knowingly accepted, utilized, and directly benefited from Plaintiff's professional piano on August 4, 2024—four paid performances in 2024, two unpaid performances in 2025. Church visitors also benefitted from hearing (and complimenting) Plaintiff's organ lessons and practices from August 2025 to June 2026. The church's childcare program also benefitted from Plaintiff's puppet shows and his participation in childcare educational activities in the church library. It would be fundamentally unjust for the church to retain the financial value of Plaintiff's specialized educational and musical services by unlawfully terminating Plaintiff's employment and his reasonable expectations of earning future wages, thus rendering him incapable of continuing to engage productively with church staff and fellow worshippers at the church.

### Part 3: Prayer for Relief

WHEREFORE, Plaintiff respectfully requests that this Court enter judgment against Defendant and award the following relief:

- **Back Pay:** Compensation for all lost wages and benefits from the date of termination to the date of judgment with a penalty of $300 per each day Plaintiff did not receive wages due.
- **Liquidated (Double) Damages:** Twice the amount of unpaid wages under Connecticut law for the forced "volunteer" hours. Punitive damages to be included.
- **Compensatory and Punitive Damages:** Financial damages for emotional distress and physical injury, plus punitive damages under Section 1981 to punish the SNEUCC's, the local church parish, and individual Defendants' egregiously malicious behavior. Medical evidence from the NIH suggests that dangerously high blood pressure can cause further damage to an aortic aneurysm. Plaintiff is seeking additional professional medical assistance.